## THE LITTLE SILVER.

(District Court, D. New Jersey. August 24, 1911.)

**1. COLLISION (§ 66*)—VESSELS CROSSING—FAULT.**

A steamer *held*, under the evidence, solely in fault for collision with a tow, alongside a tug, whose course she undertook to cross.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 66.*]

**2. DAMAGES (§ 33*)—INJURY TO PERSON.**

A woman injured in a collision while a passenger on the vessel in fault is not deprived of the right to full recovery of damages because her physical condition made her injuries more painful, or renders her less capable of a prompt recovery.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 42; Dec. Dig. § 33.*]

**3. DAMAGES (§ 33*)—INJURY TO PERSON—PHYSICAL SUFFERING—EVIDENCE.**

In an action for a personal injury, while no damages are to be allowed for pains except those due to the injuries received, pains clearly shown to be such as would naturally come from the injuries received and the shock resultant therefrom are not to be excluded from consideration, or unduly minimized, merely because they are also symptomatic of physical conditions which the injured person is then undergoing.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 42; Dec. Dig. § 33.*]

**4. DAMAGES (§ 132*)—MEASURE—PERSONAL INJURIES.**

A married woman who received serious and painful injuries in a collision, due to the fault of the steamer on which she was a passenger, which were to some extent probably permanent, and from which she continued to suffer two years after they were received, *held* entitled to recover $4,000 damages.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–385; Dec. Dig. § 132.*]

**5. DAMAGES (§ 95*)—PERSONAL INJURIES TO WIFE—ACTION BY HUSBAND.**

A husband, whose wife was injured in a collision due to the fault of the vessel on which she was a passenger, is entitled to be reimbursed for his expenditures in taking care of his wife and seeking to effect a cure; also compensation for being deprived of the aid, comfort, and society of his wife, and such future deprivation and expenses as may be reasonably expected.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 222–229; Dec. Dig. § 95.*]

In Admiralty. Petition of the New York & Long Branch Steamboat Company, charterers of the steamboat Little Silver, for limitation of liability. On claims for damages resulting from collision by Borrea Johnson and Hans Johnson. Damages awarded.

McDermott & Enright, for libelant.
Eberhard & Stites, for claimants.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

RELLSTAB, District Judge.  In response to the monition issued in this suit Borrea Johnson and Hans Johnson have answered the libel and claim damages for injuries sustained as a result of the collision of the steamboat Little Silver with a car float in charge of the steamtug Slatington.  Mrs. Johnson claims $25,000, and Hans Johnson claims $10,000.

[1] On the 19th of October, 1909, Borrea Johnson was a passenger on the Little Silver on her trip from New York to Long Branch, N. J.  About 3:12 p. m. the Little Silver left her Battery dock, on an ebb tide, with her course south southwest; and about 3:30 ran into the starboard float in charge of the steamtug Slatington.  The day was clear, and there was no obstruction to the view from the Little Silver. The Slatington was between two car floats hooked near their sterns. The latter, extending astern of her, had just come out of the East River, and was making across the Little Silver's course, substantially at right angles thereto, making for Communipaw, on the New Jersey shore.  While in the East River opposite Wall street, she had passed the tug Pliny Fiske with a hawser tow, and was gradually increasing the distance between them.  The Little Silver, with the purpose of getting astern of the Slatington, signaled the Fiske of her intention to cross her bow, to which the Fiske responded in acquiescence.  The Fiske thereupon slowed down and ported her helm, thus carrying her further to the starboard and away from the Slatington.  The pilots of both the Fiske and the Slatington say that after the Fiske had ported her helm there was ample clearance for the Little Silver to pass between the tows.  She did not make the clearance, however, but ran into the Slatington's starboard float 15 or 20 feet from its stern.  The impact threw a number of passengers from their camp chairs.  Borrea Johnson was thrown prostrate, striking the back of her head and her shoulder and the side of her body.  She was picked up unconscious, and admittedly sustained some injuries.

Being a passenger, and injured in the manner stated, the burden is upon the libelant to show a want of negligence on the part of the Little Silver.  In the petition libelant charges that the Slatington "carelessly and negligently slackened her speed" and collided with the Little Silver.  This charge is not sustained by the proofs.  It was, in fact, abandoned.  The Little Silver's master expressly exculpated the Slatington from any negligence.  The defense that the "upset" tide—that is, where the ebb tide of the East River and that of the Hudson river meet—was responsible, is not tenable.  That such tide might influence the movement of the boats at the place of collision may be conceded, but that is one of the factors in navigation that is to be taken into consideration by the navigator.  The fact of an "upset" tide at that place and of its probable effects on navigation because of the slack or swirling waters were well known to the Little Silver's pilot, and it was his duty to consider it as well as other things that might affect the navigation of boats in his course, and to so direct his steering and regulate his speed as to avoid collision.  The Little Silver did not slacken her speed or starboard her helm, but kept straight on.  The pilot did not answer the first alarm given by the Slatington, and made

no change in her speed till after the second alarm was given, when it was too late. He either grossly miscalculated, or, as is more likely, took a chance. The impact was violent. The Fiske's pilot said the Little Silver rebounded. Dr. Kavanagh, who was a passenger on the Little Silver, said she shook from stem to stern. She was beached on the New Jersey flats, her passengers and freight transferred, and subsequently put on the dry dock and repaired. The Slatington's float had two planks stove in, causing her to leak. The evidence permits of no other conclusion than that the collision was due to the careless navigation of the Little Silver.

[2] Both claimants are entitled to damages. On their behalf it is insisted that the injuries sustained by the wife were serious and permanent. Mrs. Johnson testified that she was sitting in a chair with a back, on the Little Silver, when she felt the chair going backwards; that she fell, striking the back of her head; when she awoke there was no life in her left arm; that she had terrible pains in her head, left side, and shoulder; that they had not left her, and she had them yet; that, when she got home, they helped her to undress, and she got in bed; that she was confined to her bed until the 2d of February, when she went to the hospital; that she had pains continually; that Dr. Karp put straps on her body which relieved the pain; that she was in the hospital until the 1st part of March; that before she received the injuries she was well, and had no pains in the back or side; that she had had very little trouble with her head and headaches; that she still had pains, but not as often as formerly; that before the injury she did her housework, washing, etc., assisted only by her children; that she can do very little housework now, and has to have her washing done by others; that she was weak and would faint at times, and that before the accident she never fainted; that she had been married 22 years, had nine children, six of whom are living; at the time of the injury she had a baby about two years old; that Dr. Reed had been attending her for 16 years at the birth of her children, but for no other reason, with the exception of once; that she occasionally had headaches; that Dr. Reed last attended her the Sunday before she was taken to the hospital; that he said he could do no more for her; and that she should go to the hospital.

Mr. Johnson testified that he was a carpenter by trade, and dependent upon his exertions for a living; that all through their married life and until the time of the accident his wife did all the household work, assisted only by their children, that, after the accident, she was unable to do it, and, as he had not the means to employ a nurse, he had to give up his work and give his personal attention to the care of his wife; that he stayed with her in her room nine or ten weeks; that for about six weeks he never had his clothes off day or night—part of November, December, and January; that he had to stay in the room with his wife; that she was almost out of her mind, in spells; that his regular pay was $3 a day; that he sometimes did jobs on his own account; that he had opportunity of employment during his wife's illness, but could not accept it because he was needed at home; that he was in attendance upon his wife from the day of the collision

to the 2d day of February; that he could not keep it up any longer, and she was then sent to the hospital; that he was wore out and run down and unable to work until the last part of March; that he paid the hospital doctor, and the expenses of his wife at the hospital, the former about $20 and the latter $46; that he was put to the expense of $3 or $4 in transporting his wife to the hospital; that he paid Dr. Karp $16; that he had paid something to Dr. Reed, but he did not say how much; and that Dr. Reed's drug bill must be around $25; that the winter time was the busiest time for carpenters around Seabright.

Josephine Bowser, the next door but one neighbor of the Johnsons, testified to her frequently seeing Mrs. Johnson during her illness beginning with October, 1909; that she could see her every day from her own house; that she frequently ran in to see her, finding her in bed; that before the accident Mrs. Johnson did her own housework; that she never heard of her being ill before, except at the birth of her children, and that after the accident she had not seen her do any work at all; that it was at her instance that Dr. Karp was sent for; that she was called in by the children, the husband being away; and that she, being afraid Mrs. Johnson was dying, sent a young man on a bicycle for the doctor. Dr. William J. Kavanagh had his attention called to her condition immediately after the collision. He aided in restoring her to consciousness, assisted her when transferred to another boat, and gave her his attention until she arrived at Long Branch. From there she went to her home at Seabright, N. J., accompanied by her daughter, who was with her on such trip. Dr. Kavanagh said he found her very nervous, and, from a superficial examination, the only one practicable in the circumstances, found that she had a contusion on the right side of the head, and a convulsion of the muscles of the right shoulder. To him she complained of pains in the back of her head, shoulder, spine, and buttocks. He gave it as his opinion that her condition required medical treatment. No doctor, however, was called in by the Johnsons until a week after. The family physician not being found at such time, Dr. Karp of Seabright was called in. He testified that he first called on October 26th at the Johnsons' home, and found that she had sustained injuries to the chest, spine, and head; that she was very nervous and complained of headache, backache, nausea, vertigo, pains in breathing, and sleeplessness; that for the first few days she was unable to get out of bed; that her symptoms indicated that she was suffering from severe shock and nervous breakdown; that "she must have come in contact with something to have suffered the pains she had." Regarding her condition, he said:

"I didn't think it was serious. It wasn't fatal, and I didn't expect it would be fatal; but she was too sick to be about, and had to remain in bed, and should have been under treatment continuously."

He said he could not tell positively that she had any bones fractured; that "she had tenderness over the rib; but I wouldn't state positively that it was a fractured rib; it might have been a sprained rib;" that he treated her for pleurisy, and he strapped her about the body to relieve her pains. He continued calling until about the 8th

day of November, making eight visits altogether. He first called five days in succession, and then at greater intervals.

Dr. Reed, a practicing physician at Seabright, who had been the Johnson family physician for many years, said he was called in to attend Mrs. Johnson on November 11, 1909, and continued to give her treatment pretty regularly for a year; that she improved so that he did not think it was necessary to further attend her, as they were poor people, and he never went oftener than necessary. He said:

"I made a thorough examination of the woman and found she had sustained a concussion of the spine and brain. The symptoms were not as severe, they told me, as they had been. She was in a stage of incipient insanity at that time. She had delusions, and it kept two people taking care of her and constantly watching her. She couldn't walk. She rolled out of bed once, and she was suffering severe pain. She sustained a fracture of three ribs."

He also said that the ribs "had been strapped, and were practically healed, * * * but the trouble was intercostal neurasthenia: that is, inflammation of the nerves supplying the muscles of the ribs. It is the muscles between the ribs." He also said that "she still suffers from the effects of that neuritis." As to her health before she sustained such injuries, he said:

"She was in pretty good health except she had children frequently; otherwise she was able to do her housework and washing and scrubbing and ironing, and such things."

He also said that she was of a slightly nervous temperament prior to the accident, but that the accident aggravated such condition. He said that he called upon her "two or three times a day for a long while"; that he had never sent in his bill, but that he estimated it between $150 and $200, stating that the amount was reduced from what he would charge other people because they were poor. During the year of his attendance she was taken to the Long Branch Hospital, where she remained for about four weeks, during which time Dr. Reed did not attend her. He said her condition was improved after she left the hospital, and that the last time he attended her she had a uterine trouble, due or incident to menopause or change of life, through which she was then passing; that that "is part of her trouble now."

The libelant contends that the injuries of Mrs. Johnson were neither serious nor permanent, and that she was undergoing a change of life— menopause—at the time of the accident, and that her pains and sufferings were due to and in consequence of such condition, and not to any injuries received in such accident. Such contention is said to be sustained by the testimony of Drs. Field and Bennett, who also made an examination of Mrs. Johnson at the instance of those representing adverse interests. Dr. Field's examination was made the Saturday previous to the taking of his testimony, which would make it the 8th day of April, 1911. He made his examination at the Johnson residence in the presence of Drs. Reed and Bennett; and in answer to the question, "Tell us what you found?" he said, "There was no objective symptoms. I examined her ribs. They had been broken and

entirely healed. The woman complained of being nervous and having some pain in the back and shoulders, and that's about all. There was some irregularity in menstruation she had had for about a year." He said this "might bring about a nervous condition. It generally does." He gave his opinion that the other conditions he found were not serious, and not of a permanent character.

Dr. Bennett examined her twice. He made such examinations upon the request of an insurance company. The first time was on November 30, 1909; that no other physician was present at that time; that he came from Long Branch, his residence, with the expectation of having Dr. Reed accompany him to the Johnson residence, but, Dr. Reed being absent from Seabright, he went to the Johnson residence alone. Concerning that visit, he said:

"I did not make a thorough physical examination. She was sitting up in bed. I was admitted to her room. She had bandages on her chest. They didn't wish me to remove them in order to make an examination without their physician was present. All I could do was to take her statement."

That her pulse and temperature were normal. That she said her age was between 44 and 45. That she "complained to me of being very nervous. She complained of dizziness in the head, and of sleeplessness, insomnia and pains, and that she imagined queer things." He next saw her with Drs. Reed and Field—the occasion referred to by Dr. Field. At this time she removed her outer clothing. He said:

"We allowed her to keep on her shirt. She said she was feeling fairly well except that she was nervous, and that her greatest trouble was due to menstruation. She had them every three weeks, and they were very profuse."

Her heart and pulse were normal. He said he felt her ribs and felt no trace of a fracture; that, if it had been a very severe fracture, they would have been able to locate it. If there had been a little fracture, there would be no evidence. He gave it as his opinion that Mrs. Johnson was "undoubtedly passing through what is known as the climacteric or menopause—that is, the transition state from a woman's normal (reproductive) functions to the cessation of the same"; that from what Mrs. Johnson said such menopause had begun a year previous, or October, 1909. Asked the question "During the menopause period what symptoms do you find in women?" he answered:

"You find all sorts of symptoms, particularly you are apt to find nervous symptoms, hallucinations, dizziness, pain, fear of impending death, fear of going insane; in fact, women at that period do go insane, sometimes temporary, and sometimes it is permanent."

He also said:

"If there had been any trouble from the effects of the collision, the trouble would have developed at once, and it would have been a necessity to have a physician at once."

In response to the question asked by counsel for the claimant, "And the condition of nervousness and headaches described to you by Mrs. Johnson, could that be caused by any other reason than this you have stated?" he said:

"They could have been caused by the menopause. I cannot conceive of any other reason which would cause the condition and symptoms and the train of symptoms she described. Certainly no accident could have caused them."

The damages to be awarded are to be compensatory, not punitive. They are to be limited to those due to the injuries sustained in such collision. In the case of the wife, an allowance is to be made for her pain and suffering resulting from such injuries. If such injuries are of a permanent character, the allowance must include pain and suffering yet to be endured. The making of allowance for such affliction is always difficult and perplexing, for the reason that there can be no more a satisfactory measurement of such pain, etc., than there can be money equivalent therefor. In the present case such difficulties are more acute because Mrs. Johnson before the time of such collision had entered the menopause period, through which she was still passing when she gave her testimony, and many of her pains and sufferings are symptomatic of menopause. There is no doubt, however, that she sustained severe injuries to her head, chest, and ribs, and perhaps to her spine, and that she was confined to her bed and rendered incapable of service for a long time by reason thereof, and that most of her pains, etc., are due to such injuries. Of her pains some undoubtedly have their origin in the menopause, but these were considerably augmented by such injuries. A satisfactory differentiation in the effects of these two causes of said pains, etc., is impossible, as is also the determination whether the aggravation of the pains chargeable to menopause, will endure during the whole period of such transition, and, if so, whether they will end with it.

[2] The wife, however, is not deprived of her recovery because such differentiation is impossible. A woman, passing through the physical transition peculiar to her sex, is entitled to as safe passage as any other person, and is not barred of a full recovery for injuries sustained through another's negligence because that condition makes such injuries more painful, or renders her less capable of a prompt recovery. Upon the question of differentiation in said pains, the burden is on the wrongdoer to show what, if any, of such pains are due to causes not chargeable to his neglect.

[3] While no damages are to be allowed for pains, except those due to the injuries received, pains clearly shown to be such as would naturally come from injuries received in collision and the shock resultant therefrom are not to be excluded from consideration, or unduly minimized, merely because they are also symptomatic of physical conditions that the injured party is then undergoing. The evidence establishes that the dominant cause of Mrs. Johnson's sufferings is the injuries and shock received in the collision, and that it is very probable that such pains, with more or less frequency and intensity, are yet to endure.

[4] What rule shall be adopted in estimating the damage? The very nature of the pain and suffering negatives the idea that a decision can be reached by the application of any standard of values. Pain has no market value, and suffering no scale of prices. Our best conclusions on such an inquiry are necessarily founded largely on con-

jecture. Sentiment is to be cast aside and the mind charged with seeking a rational basis for its judgment; but candor compels the admission that our best results on such inquiry are largely arbitrary. This, however, is necessarily so. The judge in such estimation acts as jury, and he must be controlled largely by what may be termed the common-sense view, such a finding as can be justified by his conscience, and which would meet with a ready acquiescence by the ordinarily discreet man familiar with all the circumstances of the particular case.

In my examination of cases cited by counsel, and such others dealing with the awarding of damages for pain and suffering as time and the pressure of other judicial work permitted, I have not found a case even substantially parallel with the one at bar. This was not unexpected, and only emphasizes the rule that the particular circumstances of the case must control. Upon due consideration of the evidence and the arguments of counsel I have reached the conclusion that an allowance of $4,000 should be made to Mrs. Johnson as compensation for her injuries.

[5] As to the husband. He is entitled to be reimbursed for his expenditures in taking care of his wife and seeking to effect a cure; also compensation for being deprived of the aid, comfort, and society of his wife, and such future deprivation and expenses as may be reasonably expected. The actual expenses are as follows: To Dr. Karp $16; conveying wife to the hospital $3; hospital charges, including medical attendant. $66; making a total of $85. To this should be added $175 to Dr. Reed, the family physician, for his medical attendance, and $25 for the drug bill. He also should receive the money value of his services as a carpenter which would likely have been rendered during the period when he was compelled to cease from such labor to take actual personal charge of his wife, which, at the rate of $3 a day during the nine weeks he so attended her, amounting to $162, is substantially what the services of such a nurse as his wife was entitled to would have cost.

As to the compensation to be allowed for the loss of the aid, comfort, and society of his wife, a marital right which the libelant's carelessness encroached upon, the observations heretofore made in dealing with the wife's pains and sufferings are in the main applicable; and for this loss, after due consideration, including .therein 'probable future deprivation and expenses, an allowance of $700 will be made, making a total allowance to Hans Johnson, the husband, of the sum of $1,147.

A decree in accordance herewith in favor of claimants may be entered.